That's correct, Your Honor. May police report? Good afternoon. I'm Cameron Benton. I'm from the Mississippi State Attorney General's Office, and I represent the state of Mississippi in this matter. I'll parlay a long recitation of the facts, but say Lisa Jo Chamberlin was convicted of a double capital murder charge and received two death sentences for her crimes. Following her conviction, she pursued a direct appeal in which she argued, among other things, a Batson claim. The Mississippi Court of Appeals reviewed the Batson claim and denied it. Following that, she filed a petition for post-conviction relief, again lodging a Batson claim under the guise of an ineffective assistance of counsel argument, and the Mississippi Supreme Court again denied that claim. The District Court for the Southern District of Mississippi, Judge Reeves, reviewed her habeas petition and reviewed only Claim 2 of her habeas petition, which was her Batson claim renewed, where she assigned error to the trial court and to the Mississippi State Supreme Court for failing to conduct a comparative analysis and find in her favor on the Batson claim. Judge Reeves agreed with the petitioner in this case from the District Court and held that the Mississippi State Supreme Court and the trial court failed to apply clearly established federal law when those courts did not conduct a comparative analysis. Keeping in mind, it's important that Chamberlain never offered any such comparative analysis in the trial court or to the Mississippi State Supreme Court on direct appeal, yet the District Court took issue with those courts' failure to conduct a comparative analysis. The State does not submit that her Batson claim was waived, only that in this instance, the District Court's holding was erroneous in that it failed to identify clearly established federal law, or it erroneously identified what federal law requires. Based on that error, set aside the deference required under AEDPA and continued to review de novo the facts of the Batson claim and found that two of the jurors were stricken in violation of Batson's commands. But didn't the District Court recognize that it was a clear and convincing evidence standard for the factual review under AEDPA? It did, Your Honor. It did cite to that standard, but I would submit that it did so and reviewed those facts without the deference required under the AEDPA, which makes that finding by the District Court erroneous. That finding is erroneous for essentially two reasons. First of all, since Batson nor Miller L., no federal case has required state courts to conduct a comparative analysis when presented with a Batson challenge. I don't believe that Ms. Chamberlain or Ms. Carlisle has cited to any case that requires as much. To the extent she has, there is a split among the circuits, the federal circuit courts, as to whether or not Miller L. requires courts to conduct a comparative analysis when reviewing a Batson claim. I submit that that on its face is enough to say that that is not clearly established federal law. There is not unanimity among the circuit courts. Secondly, I would argue that if this Court finds that a comparative analysis should have been conducted, that the Mississippi Supreme Court's opinions, or direct appeal opinion in this case, its implicit findings show that it reviewed the totality of the evidence, which included the transcripts of Vore Dyer and the Girard questionnaires. And the Mississippi Supreme Court held on direct appeal, which is the opinion with which the District Court took issue, that the totality of the circumstances, the totality of the evidence, did not support a finding of a Batson claim, that Chamberlain had failed to rebut the State's race-neutral reasons. And based on that, again, the District Court set aside the AEDPA and proceeded to the merits of the claim, where the Court did a very thorough comparison among two Girards, that being Miner and Sturgis. The District Court compared Miner and Sturgis, who were two black men struck by the prosecutor, compared them to a Mr. Cooper, who was a white Girard, who was accepted by the prosecution and later struck by the defense. This comparison was never presented to the State Courts. Chamberlain did not point to Mr. Cooper in the trial court. Chamberlain did not point to Mr. Cooper on direct appeal. She did, however, for the first time, raise a comparison in the post-conviction proceedings in front of the Mississippi State Supreme Court, which I don't believe that opinion is an issue here. However, the Court did look at that comparison, looked at the, specifically said it looked at the questionnaires, and found that the comparisons were not, the comparator, Mr. Cooper, was not similar to the two men, to the two African-American men who were struck. Isn't that a fact issue to which EDPA requires us to defer? Yes, ma'am. Under the AEDPA, I submit that that is a factual issue that is entitled to deference. However, again, the District Court held, expressly held that deference did not apply under these circumstances. So you think deference should be given to the ineffective assistance claim that had the Batson issue embedded in it? I, I don't think that's the opinion, that's not the opinion with which the District Court took issue. The District Court . . . But I'm asking you if we, if we have to consider and owe deference to the State habeas decision deciding whether counsel was ineffective in not pursuing further the Batson claim. I have not argued that in my briefs, Your Honor, although, um, Ms. Unger has, uh, in her supplemental brief to this Court, she did argue that the PCR, interchangeably, argued that the PCR opinion, um, supported their position. And, and I think not. Do you owe it deference? I would say yes. It's a State Court factual finding. Um . . . But take a scenario where Batson, unlike this case, Batson was not raised on direct appeal, and it gets raised only via an ineffective assistance claim on State habeas. And then in Federal Court, the Petitioner's trying to raise a straight-up, pure Batson claim. You would say that wasn't exhausted, right? That bringing it through an ineffective assistance claim doesn't exhaust a, a straight-up Batson claim. I would certainly make that argument with an alternative merits analysis, sure. Um, however, again, we didn't argue that the PCR, uh, opinion was an issue here, but I think Ms. Carlisle, a fair reading of their And I would add to that that EDFA requires deference to a fact finding. And it couldn't be clearer in the habeas finding that they had looked at the entire record, including the juror questionnaires, and they did not find that the black and white jurors similarly situated. I agree, Your Honor, and perhaps that was an omission on my part. At the time when we took appeal from the district court's decision, in my opinion, it's very clear that the district court only reviewed the direct appeal opinion, and I felt constrained by that on appeal here. Well, looking at the state habeas, if that's what we're going to do, do you think it's permissible for the state court, in conducting a comparative analysis, to find any disparity in the questions between the black and white jurors, even ones not stated during the Batson challenge in the trial court? Even the ones not stated by the prosecution? Right, because that's what the state habeas court did, right? It said there's differences if you look through every question. Sure, that's exactly what the state court did. They specifically said they looked at the questionnaires. At trial, the prosecutor was given his race-neutral reasons and referred exclusively to the questionnaires for reasons he struck certain jurors. And in this case, with respect to the two black jurors, he referred to three questions on a 56-question juror questionnaire that was compiled by the parties and submitted to the jurors, prospective jurors, prior to trial and selection. So I want to ask you, so the three questions here for the two struck black jurors were the identical answers, because these are written questions. It's not like the usual case where it's done orally and there's slight variances. They're exactly the same on these three questions from a white juror who was accepted. I'm just trying to figure out how you think this should apply. Could a court hypothetically that . . . let's say there was a question that said, have you had any experience with family members going through the criminal justice system? And all three of those people said yes. And the white juror said . . . or the black juror said, yes, and I thought my . . . I had a negative view of how my family member was treated in the criminal justice system. Could, on appellate review or habeas review, that be a difference that the court could rely on in finding them not similarly situated? I would argue yes. As I read Miller L. . . there is a passage in Miller L. . . I apologize, I don't have the page number, but it's at Headnote 8, and it says that the comparison among the jurors, if it applies equally to white . . . if the race-neutral reasons apply equally to white jurors who were accepted as it did to the black jurors who were struck, that is evidence tending to show pretext, and this is important, I think, which is to be considered at the third step. And the third step is where the court, I believe, should look at all the facts. And I do understand the importance of paying attention to what the prosecutor has said. However, as Justice Clement . . . You're saying in that case, the comparative juror analysis might be evidence of pretext, but there are other things you look at. Sure. I don't think . . . I think the district court erred in this regard also because the district court found primarily looking at the similarities among these three men and discounting what I think is a very significant difference among them, which is their opinions on the death penalty. And the district court stopped its analysis. It said, this is evidence of pretext, and Chamberlain was entitled to habeas relief. And I think the district court erred by refusing to pay . . . first of all, refusing to pay deference to those findings in the state court, but also refusing to acknowledge that the differences are important, particularly their views on the death penalty when this is a capital murder case. And I think, as did both opinions in the Mississippi State Supreme Court, the differences among the men, again, are important. And the court looked at everything. The court had the questionnaires and the transcripts. But if there's any differences in these questionnaires that can include 50 questions, then there's no finding of discrimination. I don't think you can paint with such a broad brush. However, I would say . . . So how do you decide? How do you decide? You look at the totality of the evidence here. And when you do that, you can't deny the facts. Chamberlain did not point to this single white comparator in the trial court. Chamberlain did not point to this single white comparator on direct appeal. The prosecutor never had the opportunity to say, this is why I kept Mr. Cooper, the white juror. Nor does he have to, under federal law. He only has to say why I'm striking the facts and challenges. Why am I striking these proposed black jurors? Let me ask you to what extent you're talking about what a good answer would be and to what extent a good way to process this problem and what the Supreme Court would actually allow. You're much more familiar on both sides, I'm sure, with Miller-Ell than I am. But my part of the debate between Justice Souter and Justice Thomas in dissent has to do with something very close to this. The majority in footnote four, there are a bunch of footnotes and I'm not asking you to remember exactly what it says, the dissent offers other reasons why these non-black panel members who expressed views on rehabilitation were actually different. And when you look at what Justice Thomas is talking about in several pages of his opinion, he's going beyond what the prosecutor said at the time during the conference about jury selection. But it does seem to me that there's at least that debate where one losing it, Justice Thomas, wants to go beyond what was actually said even to explain why the whites actually were not similarly situated to some struck black is at least a pretty strong indication that we cannot do what you're asking us to do, to look at the questionnaires and look at anything that was not specifically referred to by the prosecutor as the reason this particular juror should be struck. My reading of the case law, including Miller-Ell The case law, just Miller-Ell, what is Miller-Ell telling us? I don't think Miller-Ell constrains the court to look only at the reasons offered by the prosecution. Again, I think that that headnote eight, and I apologize I don't recall the When you compare them and the prosecutor's reasons don't add up in the direct comparison, that's evidence that tends to show pretext. Absolutely, but the dissent, the majority, enough votes for this to be the majority, the dissent errs by focusing on reasons the prosecutor itself did not offer. But didn't Miller-Ell, too, instruct us to assess the prosecutor's alleged race-neutral reason? This is a quote in light of all the evidence with a bearing on it. You can answer both questions together if you like, if you're waiting to answer mine. I'm not sure I can do that. Let's stay in order. Could you repeat your question? I apologize for trailing off there. How do we get around that footnote? You're quite correct that my question, I'm really asking how do you get around the statement in the footnote that I read to you, is that it takes issue with Justice Thomas by focusing on reasons the prosecution itself did not offer. Now, I accept, and this is a very hard standard, they weren't asked to be talking about the right jurors and comparisons and whatever else, but we're dealing with the law as handed down from on high, and I'm trying to figure out what it means. And you can add to that what Judge Clement said about other things that the Supreme Court was pointing to. I'm just trying to figure, I'm not trying, I don't have a desire in this case, other than to figure out what we are supposed to do in light of Supreme Court pronouncements. Certainly. I think the best I can answer is that once you've shown pretext, that's not the end of the analysis. And the Court is allowed to look at other facts. I submit that the opinion of the white juror, Mr. Cooper, his death penalty, his opinion on the death penalty, is not a post hoc or post trial justification for the strikes against Sturgis and Minor. It is a fact in the record, and it is a fact that the prosecution did not have a chance to explain because Ms. Chamberlain's attorney, or Ms. Chamberlain at the time, never pointed to Mr. Cooper. And if we . . . But in Miller L2, the comparators were not identified in the trial court during the Batson injury selection. It was a death penalty case, and our court said there was no discrimination relying in part on one juror's statement that he was ambivalent about the death penalty, one of the structures, even though the prosecutor didn't cite that. And the Supreme Court says that was wrong for us to substitute this reason that he was also struck based on his ambivalence about the death penalty. So how do you square that with saying you can look at other questions? It's not just what Justice Thomas said. How do you square it with what they said we did wrong? I think Miller L is just a completely different case factually. And here, with all due respect, all that the panel before could point to were statistics, which I would describe as meager, and this comparison . . . Meager when seven of the first eight blacks were struck and eleven of the first twelve whites were accepted, that's normal par for the course in your view? Well, if you look at the procedure employed, I think the prosecution has no control over how these jurors are set and how they come to him in an order. So they could have been peppered all through the venery, but there was a cluster of them, albeit pretty far at the forefront of the venery, that he went through. All in all, the prosecutor tendered five blacks to the defense, who then struck three. So the resultant jury had two blacks on the jury. That's not entirely the prosecution's fault. And I have argued and would maintain had the defense, and I realize the defense doesn't have to, but had the defense accepted every black juror tendered to it, the resultant jury would have mirrored the percentage of the qualified venery. Is that . . . am I clear about that? So the qualified venery included roughly, I believe, 30 percent African American. The prosecution tendered five African Americans for the defendant to consider sitting on the jury. The defense struck three of them. So that leaves two people sitting on a 14-person jury, including the two alternates. Had, let's just say four of them, it was plausible that four of them could have sat on that 14-person jury. That would have been roughly 30 to 33 percent African American on the jury. What authority says that's the key consideration versus the disparity in actual strikes exercised between whites and blacks? Again, I'm going to tread carefully here, and I have the utmost respect, but the panel opinion that was vacated earlier relied on percentages such as the makeup of the jury, that there were two African Americans on there, which I think is 17 to 19 percent reflection. I believe that was stated in the panel opinion. I don't have authority for that, but Miller L. also considered these statistics. I, for one, am not advocating or standing here, standing alone on statistics. I think that the statistics here are not that impressive. Aren't statistics the basis for the prima facie evidence under Batson? They are not the conclusive case by any means, right? Yes, Your Honor. The farthest we can get with statistics here is prima facie case, and Miller L. too did say, when a prosecutor gives a reason for striking a black juror, a reviewing court must, quote, assess the plausibility of that reason in light of all evidence with a bearing on it, close quote, Miller L. at 251-252. Yes, ma'am, and I think this goes back to Justice Costa's original question on the direction I was heading, is that Miller L. is substantively and quantitatively so different from this in finding that discrimination had taken place and not just a comparative analysis and certainly not just statistics. Miller L. had the office's history of discrimination, jury shuffling, disparate questioning, a variety of things that are not present here. And the district court, again, focused solely on the answer to those three questions, and I understand that they gave the exact same answers to those three questions, but that's not all there is in this case. How many peremptory strikes did the prosecution have available to it? The prosecution had 14 strikes available, and it exercised 13. The defense exercised all 14. What about Juror Carter, the black woman who was kept, and she answered questions 35 and 34, 30, and 35, the same as the black jurors who were stricken, except she answered question 53, just like Juror Cooper did, and she was kept a black woman. So how do you explain the allegation of a black woman? Well, if I'm permitted to give an explanation, I would say it would be her opinion on the death penalty that breaks that tie. It's up to the court, I suppose, if you're going to do that. But it seems to me that the court needs to look at all of the evidence instead of focusing on three questions. It just doesn't yield fair, or it doesn't yield the truth of what actually took place there. When did the state first argue question 53? When did that first come up by the state, do you know, during the process? I would assume, I don't know for sure, but I would assume when Chamberlain first pointed to Mr. Cooper, which would have been in the petition for post-conviction relief. Certainly we argued that in the district court for the habeas case, and that was the first time the state had become aware of Mr. Cooper. Was there some meaningful bore dire of these jurors once answered those questions by the state with regard to their responses to these questions? There was some bore dire among these three men. I don't think there was anything significant. I don't think there was anything that, I don't recall anything that was related directly to these three questions. I apologize. The district court did the opposite of what Miller-Allen struck. In other words, it only, it refused to allow consideration of anything other than those three questions. If that occurred, what's the relief? Would it be a remand back down to the district court to reassess the totality, but given the fixed record from the state courts? Or is there some sort of opening, even under 2254E for new evidence? I have asked the court in our supplemental brief to reverse and render on this Batson claim. It seems to me if the district court gets another swipe at it, you know, I think you could send it back and tell the district court, you have to look at this through the AEDPA and you have to pay deference to this, and we can consider the Batson claim again. I see my time is up. Thank you. You've reserved your vote time. Ms. Carlisle, my notes say you want uninterrupted time for your first half, is that right? My notes show you want uninterrupted time for your first portion, is that correct? That's right. I don't think I'll use 15 minutes, but I would like a little head start. All right. You're up. May it please the court, I'm Elizabeth Carlisle. I'm here with my colleague, Michael Bentley, on behalf of Ms. Chamberlain in this case. And the first point that I would like to make for the court is that if you were a black prospective juror on her jury pool, you were three and a half more times likely to be stricken by the prosecutor than a white prospective juror. I think that's the relevant statistic. And while statistics certainly are required to provide a prime aphasia case, they can also be considered in connection with whether there's sufficient evidence of pretext. And I think in this case, that's strong evidence, but it's certainly not all there is. There seems to be a suggestion here that the prosecutor, that the process here isn't fair to the state or the prosecutor, because Ms. Benton alleged that the prosecutor had no opportunity to mention Mr. Cooper. Of course he had an opportunity to do that. Miller L. had been decided a year before this case was tried. He knew jury comparisons happened. He had the questionnaire answers before the trial. He had overnight before the strikes to consider them. And so had he wanted to, he could certainly have said, you know, I'm striking these two prospective jurors because of their answers to these three questions. I know Mr. Cooper, who I've accepted, answered them the same way, but the fact is he's stronger on the death penalty. Could he have said that? Of course he could have, but he didn't. Is there any... She's still around. Oh, I'm sorry, excuse me. Go ahead. I want to take a minute, though, before we get back into the facts, to talk a little bit about why the Mississippi Supreme Court's decisions, both of them, were contrary to clearly established federal law. In the first case, the assertion that the Mississippi Supreme Court on direct appeal considered the whole record is just not supported by its opinion. What it said was that Ms. Chamberlain, with respect to Mr. Sturgis and Mr. Minor, had not rebutted the state's reasons. That's not a statement that we've looked at the whole voir dire, we know about everything. What it said was, because she hasn't rebutted the state's reasons, the plausibility of those reasons is the only thing that's before us. That's just not what Batson says they're supposed to do. It looks like, according to that formulation, the only way she was going to win her Batson claim in that forum was to prove that Mr. Sturgis and Mr. Minor didn't answer those questions that way. Well, they did, but the analysis can't stop there, and that's why this first decision was contrary to clearly established federal law. Now, the second time, they did get another bite at the apple. This isn't like Miller-El, where they never got to hear about the state court answer, the comparative jury analysis at all, until it got to federal court. They were given the comparative jury analysis, and they considered it in precisely a way, as I think Judge Costa recognized, that is contradicted by Miller-El. They said, we looked at the comparators, they're not identical, so there's no disparity. And Miller-El says, jurors aren't the product of cookie cutters. You can't have that rule. So the Mississippi Supreme Court's decisions were contrary to clearly established federal law, which of course reduces the need to defer to their factual findings. But the fact is that Judge Reeves expressly said that he did use the AEDPA standard. You know, the state said, it doesn't feel to us like we did. They don't agree with the way he did it, but he cited the AEDPA standard, and the need to find a clearly unreasonable determination of the facts on the record before he made his determination. So because of that, I think this Court is bound by Rule 52 to consider the district judge's factual findings as valid, unless they're clearly erroneous. So what the district court said was, the responses of Mr. Sturgis and Mr. Minor were identical to Mr. Cooper. Miller-El tells us that's evidence of pretext. The district court also specifically noted that there were many other things that the three of them had in common. He noted that if you looked at Cooper, there were at least two factors that made Cooper a less desirable juror for the state, his arrest record and his health problems. What the court wouldn't do, what the district court refused to do was to give controlling weight to the facts that Mr. Cooper answered the other question about what he thought about the death penalty differently than Sturgis and Minor. He certainly didn't ignore it, but what he said was, the prosecutor didn't say anything about that. Miller-El tells me the prosecutor has to stand or fall on the reasons he gives. So he considered it, but what the state would have this court do was simply ignore the fact that the prosecutor didn't mention it and say, well okay, if we'd known about this, we would have found that to be race neutral. What Miller-El says is, what the prosecutor says is real important. The reason it's real important is because what this is about is this prosecutor on this day in this trial. And it's about racial discrimination and jury selection, which the court has said is so serious that one instance of it requires rehearsal. And so the fact that, you know, everybody else might think, gee, we think that perhaps the prosecutor might have decided not to strike Mr. Cooper because of this answer doesn't really tell us what the prosecutor did as well as what the prosecutor actually did. And so I think when the court considered all of the evidence before at the district court, including the pattern of strikes that I talked about, the fact that the only black jurors accepted were at the end, which Miller-El again said might be kind of evidence of pretext, I think it's clear that the district court's findings were, as the Supreme Court said in Anderson v. Bessemer City, they were plausible in light of the record. The fact that there might be another permissible view that this court, members of this court has, simply doesn't permit reversal. And I'd ask the court to affirm the district court. And if I can grab my water, I will be ready for the question. You ready now? I take that you're now ready for a question. So Madam Clerk, adjust the clock so we'll know our full running time. All right. She's wide open. The one question I had, and I really don't quite know the answer to it, but I've never defined any explanation in any of the cases. Is there any analysis or stated explanation why in this particular issue of jury comparisons that the court has ignored the basic fundamental argument that, or principle, that we do not entertain questions or issues that have not been raised below? And then specifically, we require the district court to be able to or the other counsel to be well-informed about the basis of your objection in order to respond to it. I mean, I just, I see that it seems to be ignored, but I've never seen any acknowledgment that you can raise issues that have never been raised before. Well, I actually think Miller-El sort of addresses that. What Vats and Miller-El say is, you know, they set out this three-step process. And step three, they instruct that the trial court is to consider the whole record. And, I mean, that pretty clearly means not just what everybody said, but the whole record. So the trial court already, the trial court presumably, when it does the trial, already knows that. It knows that the whole record of jury selection is going to be before it. I mean, the 11th Circuit did speak to that, I think. In fact, the 11th Circuit, at one point, before Miller-El, I guess, refused to consider jury comparisons had not been raised below, basically because they had not raised it and given the court an opportunity to answer it, nor had they given counsel an opportunity to answer it. But then Miller-El comes along and, which your answer to me indicates, they have given no explanation for disregarding a time-honored, well-established principle that is applicable in all other death penalty cases as far as I know. And I just have been sort of puzzled about the fact that they would go to that extreme. I mean, and I certainly can't tell you that I'm able to read the mind of the United States Supreme Court. I've never felt that I was good at that. I do think that what they were saying in the Miller-El and Snyder decisions, though, was that if the data is before the court, the court would have to consider comparisons. You know, when the trial court hears the prosecutors say, this is why I struck these three jurors, the trial judge needs to think about whether that applies to jurors that weren't struck. And that's part of considering the whole record. And I would also point out that in this case, the comparative jury analysis was presented for the Mississippi habeas court petition, but I don't believe that they responded to it. Well, Ms. Carlyle, I sort of take issue with the way you characterize the Mississippi habeas court finding because that was when Chamberlain did offer the comparative juror analysis, and the court says, a thorough review of the record in this case, including the jury questionnaires, discloses that each of the African-American jurors struck had at least one response in his or her questionnaire that differentiated him or her from the white jurors who were accepted by the state. Now, that is not a requirement of identicality. That is saying at least one question that differentiates, which seems to me very difficult semantically to distinguish from the court saying not . . . Supreme Court, U.S. Supreme Court saying not similarly situated. And then the court says, therefore, we are unable to find disparate treatment of the struck jurors. And because we find no disparate treatment and no evidence of pretext, we cannot say that counsel was deficient. Now, how do we not defer to those findings? I guess I just don't read that language the same way. I think when they say at least one response in his or her jury questionnaire that differentiated him or her from the white jurors who were accepted by the state, that just sounds an awful lot to me like the rule that Miller L. specifically rejected, which was to say they don't have to be identical. We may have to disagree, but that sounds like exactly what the U.S. Supreme Court said you can't do. And another reason I would respectfully disagree with you is not just on the plain language here, but also on the principle that we established many years ago in EBSA review, which is that we do not . . . we review the state court's decision, not every tittle and jot of the reasoning. And therefore, even if you say this is not identical, but if reasonable minds can differ on whether it's identical, identicality, which I . . . they still say a thorough review of the record differentiated and no evidence of pretext, no disparate treatment. I mean, I don't have anything else to say about what they said. I guess what I would say, though, in terms of the way EBSA review happens, in determining whether a state court decision is contrary to clearly established federal law, I think the court does look . . . has to look at the standard of review that's used. And I guess my argument here, and as to that one, at least, we disagree. My argument here is that in both the direct appeal and in the post-conviction review, they used the wrong standard. Well, but the critical thing about that is EDPA differentiates the standard of review of legal questions versus factual questions. The panel majority here . . . yeah, the panel majority here expressly said we are not going to rule on whether the Mississippi courts were in error on the legal questions. We find the factual finding wrong by clear and convincing evidence on the record. I agree that that's what the panel did, and I guess what I'm saying is . . . You're going to disagree with the panel on that. I think what the panel did was to say we don't have to deal with the legal issue because we find the factual issue. I'm saying this court can do either one. The only difference it makes, I guess, is how the legal . . . the factual issue is analyzed, and frankly, I think we need a way on the factual issue. Judge, do you have a . . . I had a follow-up question about the language in the direct appeal. I thought you were dismissing it because you said, well, it decided that the Mississippi court decided that the defense didn't meet its burden, and that's all it said. But the next sentence says, Considering the totality of the evidence, the trial court's ruling on Chamberlain's bats and challenge was neither clearly erroneous nor against the overwhelming weight of the evidence. And, you know, the court has done a more robust analysis than is often done in these cases, but are you faulting them for doing a robust analysis? Because don't we look at the key sentence that says, Considering the totality of the evidence, the trial court's challenge was neither clearly erroneous nor against the overwhelming weight? And how can we just disregard that? Well, I think we can disregard it because just before they got there, they said, Chamberlain argued reasons why they, Sturgis and Meyer, would make good jurors, but failed to rebut the specific reasons proffered by the state for striking them. The objector must come forward with proof, given the opportunity for rebuttal. And then later on said, because Chamberlain failed to offer any proof that the state's reasons were protectual, the state's reasons for the challenges were the only considerations before the trial judge. So I think when you look at the state's conclusion in light of that explanation of how it gets there, it becomes much more problematic. Well, I still don't understand why that's problematic. Can you please articulate why we can ignore the conclusion that it considered the totality of the evidence and determine there was no error in the pretext decision? I guess because I think what the state court is telling you is that they did not, that when they say the state's reasons for the challenge were the only considerations before the trial judge, therefore the totality of the circumstances shows that Chamberlain loses, that doesn't sound to me like they're looking at the questionnaires. Ms. Carla, let me ask you, are you finished answering? Let me go to Judge Higginson and try to get him in. Is that okay? My one significant concern, and as an aside, the difficulty would be the footnote for the final two sentences that I think Judge Selkirk focused on. But I think when the district court says responses to questions other than 30, 34, and 35 cannot be considered, my view is that turns Snyder and Miller L. upside down. What the district court mistakenly did was took the stand or fall language that is explicitly textually tied to the reason actually given for the stricken juror and took it to an entirely different context and said, when we allow a defendant to raise something that the defendant didn't raise, now the government can't give any reason, first-time reason. So, to me, that's an asymmetry that would reward defendants to specifically not raise a comparative juror analysis. When no one denies, the government at that point absolutely would go to all the questions and says, well, if you don't bring it up in a timely point, then later on the government won't be allowed to. The district court will do just what it did here, 30, 34, and cannot, we can't look. So what's happened is the Prima Fascia case has now swallowed the Batson third prong. Okay. I guess what, I mean, I think what Miller L. tells us about that is that, again, the point here is what did this prosecutor do? And there's only one time we can find that out, and that's a trial. So that's why the prosecutor has, grant you, a pretty heavy burden. He has a burden of presenting all of his race-neutral reasons, so the court . . . Miller L. to require every time a trial judge hears a Batson objection to say, now we've got to go into comparative juror analysis. No court has ever said that. So you're saying the government's got to interpret the Miller L. stand or fall concern to mean it stops every time and says, by the way, Cooper answered those questions similarly, and I really need to now talk about everything else that did or didn't happen. I don't see any court having read Miller L. to require that. Well, I kind of think Miller L. read it that way. That is . . . But Miller L. in footnote 15, the majority says, even the state is offering new evidence, and, therefore, they've waived, arguably, and we'll consider that. And by the time Souter gets to section 2B, he says, I'll even consider disparate questioning. Miller L. does exactly what Snyder does, which says, let's look at everything in minute detail, and then the judge has to make the very hard decision of this prosecutor, you're being dishonest or not. But what Miller L. and Snyder never do is say, government, we're going to decide if you're dishonest, and we'll never even let you give a first reason as to why you're not. You're stuck with the reason you gave for striking the non . . . the juror, but of course you get a chance to give a first reason for why other jurors were acceptable to you. Well, I guess what . . . first of all, I think what the district court did . . . the district court did say that. I mean, and I read the way the district court said it to mean, the only reasons the prosecutor gave . . . only the reasons the prosecutor gave at trial are the ones that we can consider. We can't consider that the prosecutor gave other reasons . . . we can't consider other reasons as . . . May I just interrupt? You keep saying that, but you aren't finishing the sentence Miller L. used, which is the reason for the stricken juror. I agree, the government can't change a reason given, but Miller L. doesn't say the government can't give a first reason that you agree it would have given had the defendant made a timely objection. I don't know whether . . . of course, whether the prosecutor would have given that reason or not. Okay. I mean, I . . . Before . . . before . . . whether acceptable or not, let's give counsel a chance to answer fully the question, whether it's an acceptable answer or not. I'm not sure that's happening. Have you responded as best you can to Judge Higginson's question about Snyder and the other parts that were in there? Have you completed your answers, all I'm asking? I don't think so. I did get kind of tangled up there. Answer his question as succinctly as you can, and hopefully you will be allowed to finish the answer is what it really is. I think what Snyder and Miller L. tell us is that the issue of jury discrimination in . . . racial discrimination in jury selection is unusual because it focuses on the decisions of a particular litigant and important enough that even a reviewing court . . . that a reviewing court can review facts that were never placed before it anywhere else. I think Miller L. is just 100% on top of that. I mean, essentially, in this case actually, in Miller L. and Snyder both, the whole . . . the comparisons were never presented in state court at all. If the government . . . if the state there were saying, you know, hey, we should be able to give our answers to whether or not the comparisons were right with the same weight as our original answers, I think what Miller L. says is that's not true. So, what happened . . . Judge Clement has . . . That's my answer. Judge Clement has . . . I guess it's Judge Clement's turn. Sorry. Ms. Call, this morning you said, or this afternoon, whatever it is, that the prosecutor had an objection to a Batson challenge, that he has to explain his rationale for keeping white jurors. I don't . . . that's never been the law, and I don't see how that could possibly work. Is that your position? There's certainly no case that says, quote, the prosecutor has to explain the reasons for keeping comparable white jurors. I think what . . . I've actually heard prosecutors do it, but I think what Miller L. should have taught the prosecutor is, if I am excluding black jurors for reasons which apply identically to white jurors, I ought to think about adding to my explanation of why I'm excluding the black jurors to explain that, because otherwise it's going to be possible way down the line for somebody to take a look at that. So I don't think it's so hard to do. If this prosecutor had sat down and made a little chart about how everybody responded to these three questions, it would have been obvious to him that Cooper, Sturgis, and Minor were the same. But what about comparing the comparator? What about Cooper being similar to a black juror who was accepted? What do we do with that? Well, again, that's not something that the prosecutor suggested. Okay, but then doesn't that vitiate the notion of this being a fair comparator? If that other answer that wasn't mentioned is what makes the black juror and the white juror who were accepted different, how can you say that's, well, that's pretextual, that's racial, that's post-talk, because that's being applied race-neutrally? Well, I guess the problem I have with comparing Cooper, about whom no reasons were given, to Clark, about whom no reasons were given, is that what the court is supposed to rule on is the prosecutor's reasons. I mean, this isn't about how many black jurors are on the jury. But this isn't playing chess three layers down, where you've got to anticipate three more moves down and figure out, well, if they argue that, I'm going to argue that, and if they argue that, I'm going to argue that. What kind of burden is that? The issue is you can't bring up the, like, you can't add at the end, well, he didn't look me in the eye, and I didn't say that to the district court, but that's an additional reason. Isn't that very different than having to anticipate and rebut things, arguments that have never been made about other people? I guess I don't think so. I mean, I think it's kind of the same thing. I mean, if the court, what happened in Miller-Ell was the federal court said, well, you know, these black jurors were identical to the accepted white jurors, and the state then tried to say, yeah, but he didn't, you know, look me in the eye or whatever, and what Miller-Ell said is, you know, that reeks of afterthought. So the case law clearly says you can't come up with a new reason for the strike. That's right. If we were to say, but you can come up for, when the comparison is done, you can come up with a new reason for keeping the white juror, isn't that just the flip side of the coin? I mean, here, for example, the state's saying, well, look at 53, and Cooper said strongly favor the death penalty, whereas one of the black jurors said no opinion on that. So you can't say, well, the black juror wasn't enthusiastic about the death penalty because that would be a new reason he was struck, but you can say the white juror was strongly enthusiastic about it. I mean, what's going to be, how are you ever going to be able to show, or what's going to remain of the stand or fall rule if you can just flip it into a reason for keeping any disparity a reason for keeping the white juror? I think that's right. I mean, I think that's exactly the problem, that the idea of Miller-Ell is that the prosecutor must stand or fall on his reasons, and as I say, the reason for that, I mean, that's not just a matter of, you know, we want to be mean. It's a matter of we are trying to focus here on racial discrimination by litigators, and of course they're looking back at Miller-Ell. May I ask you a question, please? Sure. Because what you were saying Miller-Ell said is that unlike all other Title VII law on which it is based, unlike all other discrimination law I'm aware of, because it all goes back to Title VII and the shifting burdens of proof, you are either conflating prong two and prong three, Batson, or else you are putting totally disparate burdens on each side when the court has repeatedly said that the burden remains with the objector, the defendant in this case. Now, take Foster v. Chapman, decided by the U.S. Supreme Court in 2016. That case overturned a death penalty that was issued about one year or maybe just a few months after Batson came down, and in Foster the Supreme Court looked at newly discovered 25-year-old prosecution records to fortify the conclusion that the prosecutor discriminated in jury selection, and those were newly discovered. So you're saying it's okay for the defense to bring up stuff 25 years after the fact in order to explain the prosecutor's malign motive, and it was malign motives in that case, but it's not okay for the prosecutor to say not only did they answer these three questions about the death penalty equivocally, but they had a real different answer. Do you strongly favor the death penalty? They can't even bring up something that is totally germane to the person the prosecutor adduced at trial. How can you reconcile Foster and Miller L. too? I guess I don't know Foster well enough to answer that question. Nobody has cited it in this case in any of the opinions or in the briefing, but it's there. In Foster there was a smoking gun evidence of the notations of the prosecutors specifically saying striking the blacks, etc. It's unlike any other case to be found, and the Supreme Court scoured the record and found prosecutors apparently hadn't heard of shredding machines, so they didn't shred the smoking guns. It was the evidence in their own handwriting, so it's an atypical case in the sense of there's the notes, so it's probably why it's not cited. Judge Stewart has come to your rescue. May I ask a question? On this record, in reading this for Dyer, it doesn't look like the prosecutor ever got a burden, that the burden ever shifted to the prosecutor. Does that matter? If the burden never shifted to the prosecutor because the trial judge didn't even find the prima facie case was made, and then he does as an alternative and says it probably doesn't matter, but I'm going to go through this. If the burden never ever shifted, did he still have this really large burden that you talk about? What do you do with that? I guess what I do with that is I think what the United States Supreme Court has said is if the prosecutor is required by the trial court to give reasons, and the prosecutor here was. What the trial court said was, I'm not sure you've made a prima facie case, there's been a prima facie case, but go ahead and give your reason. Once that happens, the United States Supreme Court says, we're not going to worry about a prima facie case anymore. But the fact is, in this case, as I think I started with, a black prospective juror was three and a half times more likely. Can I just ask you a quick question on your, you were saying when a prosecutor is going to strike anybody who's black, they better have somebody who's white that they're also striking. Isn't this essentially suggesting you make a chart of everybody's race, and that needs to be predominant in your mind, which is sort of the opposite of what Batson is really supposed to be achieving, which is race-neutral determinations of peremptory challenges? Because now you're saying everybody better focus on this, and everybody better have a white person they strike for the same reason as a black person, or you're going to have a problem. And isn't that not consistent with Batson? I mean, that's your argument, and maybe I'm misunderstanding your argument, but that's what you said. Well, I mean, I guess I think, obviously, ideally, the prosecutor wouldn't think about race at all, and that's what we're hoping. I don't think that at this point is the situation we're living in, and so what that means is the prosecutor, and I've been one, by the way, has to consider that there may be challenges to his or her strikes based on race, and I don't think he or she is going to be able to expect him or her to be ready for them. All right. Ms. Carlisle? All right. Got a red light. Thank you. Ms. Benning, you have your repo time. First, I'd like to point out that we did cite Foster in our brief for panel re-hearing, for in-bunk re-hearing, I believe it was, and again, Foster is more akin to Miller-El in the facts of this case in that you had copious amounts of direct proof of discrimination. Secondly, I think Ms. Unger makes, or Ms. Carlisle, I apologize, makes, almost makes my argument for me. Throughout her briefs to this court and throughout the argument today, she repeatedly places the burden on the trial court or the prosecution to come forth and compare stricken jurors with those that were kept, and as several of the judges here today have pointed out, Miller-El does not require, nor any court since Miller-El, requires the prosecution to explain the jurors it kept. It is clearly the objector's burden to go forward with proof of discrimination, and that didn't happen here. The standard, as this court is well aware, is if reasonable minds could differ, then habeas relief is not warranted, and I think this argument today is proof that reasonable minds can differ, and I think that the lower court decisions compared with the district court decision in this case, again, is proof that reasonable minds can differ in this case, and when that is the circumstance, when that is a fact, habeas relief is not warranted, and the district court erred in that regard. I have a question about question 53, which you want us to focus on. Cooper said he strongly favored the death penalty. Sturgis, one of the struck jurors, said he generally favored it, less than strongly, but still favored it. If we were to give focus on that question, is that difference of degree between strongly and generally, even though they both favored it, enough to take them outside of being substantially similar, even though the three other death penalty questions, they had the exact same answers? I think the answer is yes. I think if we were discussing something other than some other distinction than the death penalty, then, you know, they took different newspapers. That is clearly insignificant, but their views on the death penalty here, specifically Cooper, because not only did he say, I strongly favor the death penalty, he wrote in separately, where there was no space to do that on the questionnaire, he wrote in separately for rape, murder, kidnapping, you know, whatever. So he is clearly a juror that any prosecutor would want on the jury, and you have got, I am not sure which one, maybe it was Sturgis who says, well, I generally favor it. You know, to me, that is a significant distinction, and I would be, in fact, such a distinction that the defense struck Mr. Cooper later, probably because of his views on the death penalty. My final point, I believe, is I just would like the Court to consider how, if the district court's opinion stands, if the panel opinion, majority opinion was correct, how are trial prosecutors to apply that going forward? And I think it would do exactly what we have said here today. I think it would place the burden on the prosecutor, and it would place the burden on the trial courts and the appellate courts to compare all of this information and sift through jury questionnaires when that is plainly not the case, that is not what we are looking for. Your persuasive, if we wrestle through and find that the district court did commit D-1 legal error and or didn't give appropriate deference and or flip Miller to upside down by applying the stand and fall rule to not look at the totality, why are you saying reverse and render? Why wouldn't that sort of concoction mean that we would reverse and remand to tell the district court to apply the law correctly? Frankly, I would take either one of those. I would prefer the reverse and render so the Batson claim could be laid to rest. I think we have litigated this enough at this point. But should this court decide that the district court gets another look at this with instruction, I will certainly take that. Again, if the district court's opinion is how Batson and Miller L is to be applied, this court will side with, I think the Fourth and Sixth Circuits have expressly placed an in-trial course to conduct comparative analysis. There is a split and I do believe that the Fourth and Sixth Circuits are in the minority of that split. I think the Eleventh and the Ninth are on the opposite side that say there is no such affirmative duty. So in this instance, we would ask that the court reverse the district court's grant of habeas relief and render or reverse, vacate and reverse. All right. Thank you, Counsel. Able argument on both sides. I appreciate the briefing. This will conclude the oral arguments for this morning. We will resume tomorrow at 9 with oral argument. In the meantime . . . Oh, yeah, yeah, yeah. Thank you, my colleague. Ms. Carlisle, you were court-appointed, the court, this court, all courts. We in particular appreciate our court-appointed counsel in all the cases, certainly in a death case and ones like this, to state the obvious, there are rooms beyond that. So thank you for the briefing and the oral argument and answers to the court's questions. Thank you. Thank you.